UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:17-cv-364-FtM-99MRM

HANCOCK SHOPPES, LLC,

     Plaintiff,

v.

RETAINED SUBSIDIARY ONE, LLC;
KNK FOOD STORES, INC.; THE
KROGER CO. OF MICHIGAN, f/k/a
SUPERX DRUGS CORPORATION; and
FAMILY CENTER, INC.,

     Defendants.

_____

## MOTION FOR PARTIAL SUMMARY JUDGMENT
## BY HANCOCK SHOPPES, LLC

The plaintiff, Hancock Shoppes, LLC ("Hancock"), moves the Court under Federal Rule of Civil Procedure 56 for partial summary judgment against the defendant, Retained Subsidiary One, LLC ("RSO"). In support of this motion, Hancock states the following:

### INTRODUCTION

The undisputed facts in the record demonstrate that Hancock is entitled to judgment as a matter of law on its breach of contract claim against RSO, holding it liable. There are several breaches committed by RSO, but this motion addresses only those breaches for which there are no genuine issues of material fact in dispute. The rest of the Hancock's claims will be presented during trial.

There are no genuine issues of material fact that RSO demolished the heating, ventilating, and air conditioning system ("HVAC") and the plumbing system, and failed to adhere to the contract in caring for the roof. These breaches left the leased property derelict at turnover; RSO failed to surrender a functioning building when the lease ended.

After demonstrating that RSO breached, Hancock highlights the legal and factual infirmities plaguing each affirmative defense in the order RSO presented them. Hancock identifies the undisputed facts regarding the shotgun affirmative defenses asserted by RSO. The affirmative defenses fail to survive summary judgment.

The bottom line is that RSO is unable to strip the premises it leased, and return to Hancock a shell devoid of the improvements mandated under the lease. There is no avoiding the fact that RSO breached the lease, and that RSO asks too much from its affirmative defenses. Therefore, Hancock is entitled to judgment as a matter of law. The Court should grant the motion, and hold that RSO is liable for its contract breaches.

## UNDISPUTED FACTS

1.      On August 30, 1983, the Original Development Documents for Hancock Bridge Square were submitted to Lee County.[1]

2.      On October 24, 1983, Family Center, Inc. entered into a Development Agreement with North Fort Myers Associates for the subject property.[2]

3.      On December 19, 1983, Alan M. Thomas of Family Center, Inc. signed a Notice of Commencement, wherein contractor J.M. Barker Co, Inc. was to construct a "54,000 sq. foot Retail Food/ Drug Store, consisting of concrete and steel structure, all electrical and mechanical devices, and all architectural finishes."[3]

4.      On November 10, 1984, Family Center, Inc. opened its newest Super Store, located at 13350 N. Cleveland Avenue, Fort Myers, FL 33903, representing it was a state-of-the-art, in-combination food and drug store.[4]

---

[1] Copies of the Development Documents are attached hereto as Exhibit "B."
[2] A copy of the Development Agreement is attached hereto as Exhibit "C."
[3] A copy of the Notice of Commencement is attached hereto as Exhibit "D."
[4] A copy of a November 10, 1984 article from *The News-Press* is attached hereto as Exhibit "E."

5.      On March 13, 1985, Family Center, Inc. transferred all property located at 13350 N. Cleveland Avenue to Twelfth West Coast AP 5 Limited Partnership.[5] On or about March 13, 1985, Twelfth West Coast AP 5 Limited Partnership executed a Florida Real Estate Mortgage and Security Agreement for, in pertinent part, all property located at 13350 N. Cleveland Avenue, Fort Myers, FL 33903.[6]

6.      On March 13, 1985, Twelfth West Coast AP 5 Limited Partnership entered into a lease with Family Center, Inc. for the Demised Premises, defined as "all that certain tract, piece or parcel of land situated in the City of North Fort Meyers, County of Lee and State of Florida… and any and all building(s), parking areas and other improvements now or hereafter erected thereon" (the "Lease"). *See* Exhibit A.

7.      On or about December 16, 1986, Twelfth West Coast AP 5 Limited Partnership transferred the Demised Premises and assigned its rights to Palmer Realty Company.[7]

8.      On or about February 3, 1987, Family Center, Inc. and The Kroger Co. of Michigan, under the name Superx Drugs Corporation, executed a Lease Assignment and Assumption Agreement under which Family Center assigned to Superx Drugs Corporation all of Family Center's rights and obligations under the Lease. [D.E. 2 at Ex. 2.]

9.      On or about October 12, 1988, Superx Drugs Corporation and Kash N' Karry Food Stores, Inc.("KNK") executed a Lease Assignment and Assumption Agreement, pursuant to which Superx assigned to KNK all of Superx's rights and obligations under the Lease. [D.E. 2 at Ex. 3.]

10.     On or about November 9, 2000, KNK executed a Sublease Agreement with Shoppers Bazaar.[8]

---

[5] Copies of the transfer documents are attached hereto as Exhibit "F."
[6] A copy of the Real Estate Mortgage and Security Agreement is attached hereto as Exhibit "G."
[7] Copies of the transfer documents are attached hereto as Composite Exhibit "H."
[8] A copy of the Sublease Agreement is attached hereto as Exhibit "I."

11.     On or about January 11, 2001, Shopper's Bazaar filed a Permit Application to the Lee County Building Department for the demolition of the Demised Premises to alter the space from its use as a grocery store to a flea market.[9]

12.     On or about February 9, 2005, following Hurricane Charley, Brunderman Building Company, upon request, provided KNK with a proposal for repairs to the Demised Premises. The scope of work includes the repair of the roof and mold remediation.[10]

13.     The scope of work in the February 9, 2005 proposal provided an option for replacement of the existing roof and a discounted option to repair the roof as described below:

> In lieu of the previously mentioned replacement roof, repairs can be made to the existing roof structure. The following itemizes these repairs:
> Remove existing poly-urethane and built up roof system
> Remaining lightweight concrete deck is to be cleaned, inspected, and tested for structural integrity.
> If lightweight concrete deck performs adequately the missing area of lightweight concrete will be replaced with new lightweight concrete to meet the level of the existing deck.
> A new .06 TPO membrane roof will be installed over the lightweight concrete deck. Ex. K.

14.     On October 26, 2005, KNK signed Change Order #1, accepting the option to repair the roof clause in the proposal, rather than replacing the existing roof completely.[11]

15.     On or about August 17, 2012, Richard Spang, P.E. of Pelican Engineering Consultants, LLC, prepared a report regarding the condition of the Mechanical, HVAC, Electrical, Plumbing and Fire Protection systems in the building on the Demised Premises.[12]

16.     Sometime before December 26, 2012, Twelfth West Coast AP 5 Limited Partnership assigned its interest in the Lease to FMAP Realty Company.

---

[9] A copy of the Permit Application is attached hereto as Exhibit "J."
[10] A copy of the proposal is attached hereto as Exhibit "K."
[11] A Copy of the Change Order is attached hereto as Exhibit "L."
[12] A copy of the Report is attached hereto as Exhibit "M."

17.     On or about December 26, 2012, FMAP Realty Co. sent a demand letter to KNK which outlined the deficiencies in the maintenance of the property. Amongst the list of items that required attention, it was pointed out the "HVAC units appeared to be damaged beyond repair".[13]

18.     On or about February 13, 2014, FMAP Realty Co. executed a Lease Assignment and Assumption Agreement with FMAP Realty Company, LLC, pursuant to which FMAP Realty Co. assigned to FMAP Realty Co. LLC all of FMAP Realty Co.'s rights and obligations under the Lease.

19.     On or about May 1, 2014, Linda Morin, as property Manager of the Demised Premises, sent a letter to Robert Stroud, counsel for FMAP, stating, among other things, that before May 6, 2014, they would "Remove air handlers."[14]

20.     On or about May 2, 2014, in connection with the plaintiff's purchase of the subject property, FMAP Realty Co., LLC executed an Assignment of Lease Agreement with the plaintiff Hancock Shoppes, LLC, pursuant to which FMAP Realty Co., LLC assigned to Hancock Shoppes all of FMAP Realty Co., LLC's rights and obligations under the Lease. [D.E. 2 at Ex. 4.]

21.     Under Section 29 of the Lease, "[u]pon the request of either party, . . . Landlord and Tenant agree to execute, acknowledge and deliver to the other . . . a written instrument . . . (a) certifying that this Lease is in full force and effect, or if there have been modifications, whether this lease is in full force and effect as modified . . . [and] (c) stating whether . . . the other party hereto is in default . . . ." Ex. A §29.

22.     Under Lease Section 29, "It is the intention of the parties hereto that any instrument requested pursuant to this Section 29 may be relied upon by fee mortgagees, Mortgagees or

---

[13] A copy of the correspondence is attached hereto as Exhibit "N."
[14] A copy of the May 1, 2014 letter is attached as Exhibit "O."

prospective purchasers or assignees of all or portions of the respective estates of Landlord and Tenant with respect to this Lease and/or the Demised Premises." *Id.*

23.     On or about May 1, 2014, the defendant Retained Subsidiary One, LLC ("RSO") executed and delivered a Tenant's Estoppel Certificate to FMAP Realty Co., LLC representing that the "Lease is in full force and effect, and has not been amended, modified, changed, or supplemented . . . .", and "there are no uncured defaults by Landlord or [RSO] under the Lease." [D.E. 2 at Ex. 5 ¶¶ 2, 7.]

24.     Toni More was the property manager for Delhaize America's subsidiary Sweetbay, also known as KNK, in Tampa, Florida.[15] Ex. P at 6:17–7:12.

25.     In or about 2010, Ms. More reviewed the Lease. *Id.* at 34:10–23.

26.     In or about 2010, Ms. More visited the Demised Premises. *Id.* at 87:18-22.

27.     When asked why Sweetbay did not perform repairs to the Property during the three years she was property manager, Ms. More testified: "We did…emergency necessary repairs… we typically did not do repairs to any closed store prior to the turn over it had to be in a time frame." *Id.* at 142:4–17.

28.     In the course of inquiring why RSO would not typically do repairs before turnover, counsel for Hancock asked Ms. More, "[C]ould it be that if you made repairs to a vacant store before the termination was coming that you would have to make the same repairs again at the termination time?"; Ms. More answered, "Yes." *Id.* at 143:1–5.

29.     When asked whether there were any other reasons as to why it would make sense until of the end of the Lease term to do repairs, Ms. More testified, "Expense. . . . Operating stores I mean just putting out more expense in a vacant store that's not in use." *Id.* at 143:6–12.

---

[15] A copy of the deposition transcript is attached as Exhibit "P."

30.     When asked whether "It makes more sense to not spend the money until it's required under the Lease," Ms. More testified, "Correct." Ex. P at 143:21–25.

31.     Travis Klein was a mobile engineer for Jones Lang Lasalle ("JLL"), hired by RSO's property manager, Delhaize America, to assist with inspection and maintenance of the Demised Premises.[16] Ex. Q at 11:23-12:13.

32.     On or about 2013, Mr. Klein inspected and performed services on behalf of JLL at the Demised Premises. *Id*. at 27:23-28:4; 30:11-21.

33.     The plumbing in the Demised Premises was demolished. See Ex. P at 90: 21-93:: 11, and Ex. Q at 31: 15-19.

34.     The drywall and interior walls were demolished in the Demised Premises. See Ex. P at 90: 21-93:11, and Ex. Q at 56 4:12.

35.     The HVAC system in the Demised Premises was not functional and demolished. See Ex. P at 90: 21-93:11, and Ex. Q at 105:15-106:7.

36.     Robert Stroud is a partner at Blalock Walters and was hired to represent FMAP in connection with the Demised Premises.[17] Ex. R at 12:18- 13:7.

37.     On May 2, 2013, Robert Stroud, on behalf of FMAP, sent a follow up letter to the December 26, 2012 demand:

> I understand that you spoke with FMAP's representative, Sam Stark, after receiving the December 26, 2012 letter and you outlined KNK's plans to inspect and remediate certain deficiencies with the condition of the Property. However, to our knowledge, nothing has been done to date.[18]

38.     When asked specifics of the failure to maintain the property, Mr. Stroud testified:

---

[16] A copy of the deposition transcript is attached as Exhibit "Q."
[17] A copy of the deposition transcript is attached as Exhibit "R."
[18] A copy of the Letter is attached as Exhibit "S."

> The elements were it was dark…so if you could imagine what a(*sic*)
> empty, you know, box looks like that doesn't have HVAC, has water
> leaking down in Florida, has mold, ceiling grid is falling off….

Ex. R at 23: 1-10.

39.    When asked if it was FMAP's intention to eliminate any obligations with respect to HVAC requirements under the lease, Mr. Stroud replied "No, we were not eliminating any requirements under the lease." *Id.* at 78:2-10.

40.    When asked if it was FMAP's intention to foreclose the buyer from any rights it might be able to exercise with respect to open matters under the lease, he testified "No." *Id.* at 81:17-21.

41.    Mr. Stroud testified to the following regarding the time Hancock and FMAP closed the purchase and sale agreement:

> We never waived, we never said do this, we never settled an
> agreement saying you do this, and we will release you from
> everything. It was do this, and that was it. It wasn't- it wasn't a- we
> never released them or said that they were, you know, do this and
> you are one hundred percent in compliance with the lease.

*Id.* at 68:10-17.

### ARGUMENT

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." *Id.*

### A.    Hancock Is Entitled to Judgment as a Matter of Law that RSO Is Liable for Breaching the Lease.

Florida law requires that a court view a contract's terms in relation to the other terms and provisions contained within the contract. *See City of Homestead v. Johnson*, 760 So. 2d 80, 83

8

(Fla. 2000). To construe a contract, one part may explain and provide meaning to the language in another part. *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1247 (11th Cir. 2002). Courts avoid concentrating on limited provisions in the Lease, while in the process excluding others. *See Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013).

Under the Lease, RSO, as the tenant, "shall, at all times during the term of this Lease, . . . keep and maintain or cause to be kept and maintained in good repair and good condition . . .all buildings and improvements at any time erected on the Demised Premises." Ex. A § 7A. RSO had to replace any demolished improvements with superior improvements:

> Tenant may, at its option and at its own cost and expense, at any time, make, . . . in a good and workmanlike manner, such structural and non-structural alterations, changes, replacements, and improvements and additions to the demised premises . . . provided tenant does not permanently diminish the value of the improvements on the Demised Premises or **demolish the improvements, except in connection with the substitution of improvements which are of greater value upon completion**. . . .

Ex. A §7B (emphasis added). Though not specifically defined in the Lease, an "improvement" is a valuable addition made to property, or an amelioration in its condition, amounting to more than mere repairs or replacement of waste, costing labor or capital, and intended to enhance its value, beauty, or utility, or to adapt it for new or further purposes. *See Hillsboro Island House Condo. Apts., Inc. v. Town of Hillsboro Beach*, 263 So. 2d 209, 213 (Fla. 1972).

### 1. RSO Demolished the HVAC System and Failed to Replace It with Anything.

There is no dispute that RSO demolished the HVAC system. Ex. P at 90: 21-93:11, and Ex. Q at 105:15-106:7. In 2005, RSO demolished all mechanical equipment, including the roof mounted condenser units and the interior air handler units that made up the split system for the HVAC system. Ex. R at 23: 1-10. In addition, RSO demolished all ductwork for the HVAC system. At Lease termination, RSO had not replaced the HVAC system that was in the demisted premises at all, let alone with an HVAC system that was superior to the one that it had demolished.

The Lease specifically discusses how to treat the HVAC system:

> As used herein the term "fixtures and equipment" shall mean (1) trade fixtures and trade equipment, and (ii) all installations of any kind or nature made in, to or on the Demised Premises and any Building (s) now located on …the Demised Premises, **but not including any** heating, ventilating and air-conditioning system, electrical system or plumbing system.

(Ex. A § 7D) (emphasis added). In other words, there is no dispute that the HVAC system was an improvement RSO bore the obligation to surrender to Hancock when the Lease terminated.

There is no dispute that RSO failed to replace the HVAC system with an improved system. There is also no dispute the HVAC was a particular improvement provided when the Lease commenced, and that the parties agreed under the Lease it would remain RSO's obligation under the Lease. Hancock is therefore entitled to judgment as a matter of law based on RSO's breach.

## 2. RSO Demolished the Plumbing System and Failed to Replace It.

The Lease treats the plumbing system in the same manner as the HVAC system. *See* Part A (1); Ex. A §7D. There is no dispute that the plumbing was a particular improvement provided when the Lease commenced, and that the parties agreed under the Lease that it would remain RSO's obligation under the Lease. There is also no dispute that RSO demolished the plumbing system. Ex. Q at 28:9-18. Among other things, RSO removed toilets and sinks to cap the plumbing. *Id.* The plumbing is nothing more than a rough layout of where the plumbing used to be. *Id.* at 28:16-18. Before surrendering the Demised Premises, RSO did not install plumbing that was superior to the plumbing it demolished. Thus, RSO breached the Lease as to the plumbing; therefore, Hancock is entitled to judgment as a matter of law.

## 3. RSO Failed to Comply with the Lease Obligations When It Repaired the Roof.

There is no dispute that, in 2005, RSO demolished the roof that existed when the Lease commenced. Ex. K. RSO then decided to repair the roof with a cap consisting of a single

membrane. Ex. L. The roof that existed when the Lease commenced was not a single membrane roof. Ex. K. Rather, it was a built-up roof over lightweight concrete waterproofed with at least 2 plies of fiberglass felt into hot asphalt. Ex. K.

RSO therefore breached the Lease in one of two ways. First, as with the HVAC system and the plumbing, RSO demolished the roof (an improvement) and chose to substitute it with a roof that is not superior to the roof that existed when the Lease commenced. Ex. L. There is no dispute that the roof RSO installed was inferior to the one that existed when the Lease commenced because RSO elected to have the contractor install an inferior roof to save money. *Id.* Therefore, RSO breached its duty under Section 7B.

Alternatively, to the extent RSO claims that the roof installed was under Section 15A, based on casualty loss, then it still failed to comply with the Lease. Under Section 15A, RSO bore the obligation to install the same roof that existed before the casualty: "Tenant shall cause such buildings and improvements to be repaired, replaced or rebuilt to their condition immediately preceding such damage or destruction within a period of time which, under all prevailing circumstances, shall be reasonable." Ex. A §15A. As described in the previous paragraph, RSO did not fulfill its obligation under the Lease in replacing the improvement with a single-membrane roof.

In sum, RSO chose to save money when it had to address the roof, and in so doing breached Lease Section 7B or Section 15A. There is no dispute that the roof RSO installed is less than the roof it received. As a matter of law, therefore, RSO is liable for the damages caused by that breach. Hancock is thus entitled to judgment as a matter of law.

### 4.    Although There Are Other Breaches That Entitle Hancock to Judgment as a Matter of Law, the 3 Indisputable Breaches Entitle It to Judgment.

There is no dispute that RSO demolished the improvements, leaving Hancock an empty shell where there was once a functioning building. The mess RSO left in no way amounts to

surrendering the Demised Premises with the improvements it received when the Lease commenced. At trial, and as detailed in the original complaint, RSO breached the Lease, but for the breaches discussed in Part A, Hancock is entitled to judgment as a matter of law.

**B.      There Are No Genuine Issues of Fact Regarding RSO's Affirmative Defenses, and Hancock Is Entitled to Judgment as a Matter of Law.**

When moving for summary judgment, the movant bears the burden to show that there are no genuine issues of material fact regarding the affirmative defenses alleged by the nonmoving party. "A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also, e.g.*, *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1043–44 (11th Cir. 2014). Accordingly, Hancock addresses each affirmative defense raised by RSO in the order raised in the answer.

**1.      RSO's Accord and Satisfaction Affirmative Defense Fails as a Matter of Law and Fact.**

The accord and satisfaction defense asserted by RSO misses the mark under governing law and the undisputed facts. To discharge a claim under the accord and satisfaction doctrine, RSO must show it rendered performance different from that which was claimed as due, and that Hancock accepted that different performance to fully satisfy its claim. *James D. Hinson Electrical Contracting Co. v. BellSouth Telecom., Inc.*, 642 F.Supp.2d 1318, 1329 (M.D. Fla. 2009). The agreement for substituted performance would constitute the "accord," and rendering performance would be the "satisfaction." *Jacksonville Elec. Authority v. Draper's Egg & Poultry Co.*, 557 So. 2d 1357, 1358-59 (Fla. 1990).

RSO claims accord and satisfaction based on an alleged 2013 agreement between FMAP Realty and RSO, whereby RSO would perform a list of specified repairs and maintenance as

substituted performance of its maintenance obligations under the Lease; RSO further claims it completed those items in May 2014. The undisputed facts also show FMAP, at the time this negotiation was taking place, never intended or agreed that RSO's repairing certain mold-causing deferred maintenance was full compliance with all of its obligations under the Lease. Ex. R at 78:2-10. Further, the "accord" included the requirement that the parties were to execute a written agreement; it is undisputed the parties neither drafted nor signed such an agreement. Ex. R at 82: 2-13. There was no "accord." Therefore, RSO's defense of accord and satisfaction fails.

### 2.      RSO's Contributory Negligence Affirmative Defense Amounts to a Square Peg in a Round Hole – It Does Not Fit.

RSO attempts to raise as its second defense – to a breach of contract claim – contributory negligence. [D.E 85 at 5]. RSO is claiming that after Hancock took possession of the Demised Premises, it failed to prevent further damage to the property. [D.E. 85 at 5].The case of *GE Credit Corp. v. Air Flow Industries, Inc.* is illustrative here. 432 So. 2d 607 (Fla. 3d DCA 1983). In *GE Credit*, the plaintiff claimed the defendant had breached its obligation to assign an enforceable mortgage, because the legal description of the property was incorrect. 432 So. 2d at 607-08. In response, the defendant claimed the plaintiff should have caught the mis-description before signing the contract. *Id.* at 609. In rejecting the defendant's argument, the court noted that it was "unaware of any principal under which such a claim, which amounts to one of contributory negligence, can serve as a defense to a breach of contract action like this." *Id.* at 609, n. 7. Simply put, contributory negligence has no place in a breach of contract action, and the Court should summarily reject the defense.[19]

---

[19] Though RSO calls its second defense "contributory negligence," it also argues mitigation of damages. Florida law recognizes no common law duty to mitigate damages under a lease agreement. *Wright v. Logan*, No. 6:08-cv-1538-Orl35GJK, 2010 WL 11507114 at *7 (M.D. Fla. Jun. 4, 2010). Indeed, where, as here, RSO breached the Lease, Hancock had no duty to mitigate its damages. *Coast Fed. Sav. & Loan Ass'n v. DeLoach*, 362 So. 2d 982, 984 (Fla. 2d DCA 1978).

### 3. The Lease Offered Hancock Permission, but Not the Obligation, to Provide a Default Notice to RSO, and Therefore, the Notice Defense Fails.

RSO points to Lease Section 26 in a misguided attempt to argue that Hancock's only recourse for RSO's breach under Lease Section 7 was sending a notice specifying the default, and, if RSO did not timely cure, commencing a lawsuit. Based on that argument, RSO argues that Hancock did not take this action back when RSO removed the floor, and therefore, Hancock has waived or is estopped from suing for breach. RSO is wrong as a matter of law.

As an initial matter, Section 26, by its own terms, does not state or imply it is the landlord's sole remedy in the event the tenant defaults. Rather, it states that if the tenant defaults, the landlord "**may give**" a notice of default, and that if the tenant fails to cure, the landlord "shall have the right to seek damages or an injunction…." Ex. A §26 (emphasis added). That Section 26 gave the landlord the option to notify the tenant there was a default, or to seek legal action, is consistent with the fact the landlord and tenant agreed to a comprehensive anti-waiver provision, found at Lease Section 30. *See* Part B (6), *infra*.

### 4. RSO May Not Escape Liability by Hiding Under the Statute of Limitations Affirmative Defense.

RSO has asserted the statute of limitations as an affirmative defense to Hancock's contract claims. But that affirmative defense fails for several reasons under Florida contract law. There are two overarching principles governing contract interpretation: (1) a reasonable interpretation of a contract is preferred to an unreasonable one; and (2) in the belief that the parties intended their agreement to be valid, a contract should not be readily interpreted as ineffective. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979) (cited by RSO in D.E. 102 at 7). The statute of limitations does not run when the breaching party owes the non-breaching party a continuing obligation under the contract. *See Grove Isle Ass'n v. Grove Isle Associates,*

*LLLP*, 137 So. 3d 1081 (Fla. 3d DCA 2014); *City of Quincy v. Womack*, 60 So. 3d 1076 (Fla. 1st DCA 2011).

In *Womack*, the city had an ongoing obligation to maintain and repair a dam and spillway, but stopped performing its duties more than 5 years before the plaintiff filed suit. *Id.* at 1077. In other words, the city argued the plaintiff filed suit outside the statute of limitations. In rejecting the city's statute of limitations defense, the court held the city's nonperformance constituted a continuing breach, and, accordingly, the plaintiff's claim was not limited to the city's initial breach of its obligations. *Id.* at 1078.

As alleged in the Complaint, two of the primary provisions in the Lease that form the basis of Hancock's claims against RSO do not trigger the statute of limitations defense. First, Lease Section 7A required the tenant to, "at all times during the term of this Lease," keep and maintain the Demised Premises. Ex. A §7A. As written, the Lease imposed on RSO a continuing obligation to keep and maintain the Demised Premises. That obligation included keeping and maintaining the improvements RSO received when the Lease commenced. Consequently, RSO's failure to do so at any time during the Lease term constituted a "continuing breach" of contract. *See Grove Isle Ass'n*, 137 So. 3d 1081; *City of Quincy*, 60 So. 3d 1076.

RSO also bore the obligation to maintain the improvements in the Demised Premises "in good condition throughout the term and until turnover." [D.E. 102 at 13.] In other words, RSO had a continuing obligation to maintain the improvements in good condition and turn it over to Hancock when the Lease terminated. That obligation did not end when RSO demolished the improvements; it continued up until RSO turned over the property. On turnover, RSO bore the obligation to surrender the Demised Premises, including the improvements, in good order and condition. Ex. A §23. The Demised Premises includes, in pertinent part, the improvements that existed at the time the Lease commenced such as the HVAC system, the plumbing, and the roof.

The claim against RSO for breach did not accrue until RSO turned over the Demised Premises without the improvements. Therefore, Hancock commenced its breach of contract action within the statute of limitations.[20]

There is also no genuine issue that, at a minimum, the air handler units (a component of the HVAC system) were demolished in 2014. Even under RSO's argument, it demolished improvements within the 5-year statute of limitations. Rather than returning the Demised Premises to Hancock with all the improvements provided when the Lease commenced, RSO attempts to twist statute of limitations to avoid liability arguing its several breaches occurred while it was still the tenant under the Lease. *See* Part B(6), *infra*.

There are no genuine issues of fact that RSO owed Hancock continuing obligations under the Lease. There is also no dispute RSO continued to demolish the Demised Premises throughout the Lease term. Accordingly, the statute of limitations offers no shelter from liability.

### 5. Laches Does Not Offer RSO Protection from Liability for the Contract Breaches It Committed.

Not only does the statute of limitations defense fail, but laches is equally unavailing. In Florida, laches requires, in pertinent part, that the plaintiff has delayed filing a lawsuit, the defendant did not know that the plaintiff would sue, and the delay in suing prejudiced the defendant. *Department of Revenue ex rel. Thorman v. Holley*, 86 So.3d 1199, 1203 (Fla. 1st DCA 2012). "A laches defense is predicated on the contention that a plaintiff has unreasonably delayed the filing of a claim in a manner making it inequitable or unjust to allow the plaintiff to seek the relief." *In re Checking Account Overdraft Litigation*, 2013 WL 5774287, Case No. 1:09-MD-02036-JLK, *1, *3 (S.D. Fla. Oct. 24, 2013). "Accordingly, '[t]he laches defense requires a detrimental change in the position of the one asserting the doctrine, as well as an unreasonable

---

[20] Not only does the statute of limitations defense fail as a matter of fact and law, it also interferes with the parties' anti-waiver agreement (*see* Part B(6), *infra*)

delay by the one asserting his or her rights against whom laches is invoked.'" *Id.* (alteration in original). But as the court in *In re Checking Account Overdraft Litigation* held, "laches is inapplicable to Plaintiffs' claims for breach of contract . . . because laches does not apply to actions at law." 2013 WL 5774287, at *3. The *Overdraft* court also concluded that laches did not apply to the unjust enrichment claim because the only relief sought was money damages. *Id.*

In the instant case, Hancock brought only one claim of action against RSO: breach of contract. Hancock Shoppes seeks only damages from RSO. Laches does not apply to Hancock's claim. Therefore, Hancock is entitled to judgment as a matter of law regarding the laches defense.

In addition, as a matter of fact, RSO's laches defense fails in this case. Specifically, RSO has alleged that Hancock failed to take proper care of the Demised Premises after the Lease terminated. [D.E. 85 at 6]. Thus, RSO urges the Court that sending a demand within approximately 7 months after Lease termination, and commencing the suit 2 years after Lease termination was too much delay. Never mind that Hancock commenced the case 3 years before the statute of limitations had run; RSO did not request to inspect the Demised Premises when it received the demand. Instead, RSO now argues Hancock's failure to maintain the Demised Premises after termination caused prejudice because it cannot provide evidence of the Demised Premises' condition at turnover. That argument fails for several reasons. First, there is no dispute that RSO demolished improvements on the Demised Premises. Ex. R at 23: 1-10. Second, RSO retained property managers who inspected the Demised Premises on at least a monthly basis, and those managers memorialized the inspection results. Ex. P at 56:15-57:5. Third, there are no facts that show RSO changed its position in reliance on the delay.

The laches defenses does not apply here. It is undisputed Hancock has not alleged a claim in equity, or that the delay complained about caused RSO any prejudice. Therefore, Hancock is entitled to judgment as a matter of law on the laches defense.

**6.      RSO's Equitable Estoppel and Waiver Affirmative Defenses Fail under Florida Law and the Undisputed Facts.**

The equitable estoppel and waiver defenses are similar, and Hancock addresses their defects together to avoid repetition. The equitable estoppel defense requires the defendant establish that (1) the plaintiff made a material misstatement of fact, (2) the defendant relied on the representation, and (3) the defendant changed its position in reliance on the representation. *Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So. 3d 915, 923 (Fla. 3d DCA 2010). The waiver defense requires the defendant demonstrate (1) at the time of the alleged waiver, there existed a right, privilege, advantage, or benefit the plaintiff could waive, (2) the plaintiff knew or should have known about that right; and (3) the plaintiff intended to relinquish the right. *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1104 (Fla. 5th DCA 2006).

Florida courts have consistently enforced anti-waiver clauses in contracts. *Nat'l Home Communities, L.L.C. v. Friends of Sunshine Key, Inc.*, 874 So. 2d 631 (Fla. 3d DCA 2004). Anti-waiver provisions of a contract defeat, as a matter of law, the defenses of waiver and estoppel. *Rybovich Boat Works, Inc. v. Atkins*, 587 So. 2d 519, 522 (Fla. 4th DCA 1991). There is no dispute that the Lease contains an express term that eliminates waiver, which is binding on RSO:

> Failure of Landlord or Tenant to seek redress for violation of or to insist upon the timely performance of any of the terms, covenants, or conditions of this Lease **(regardless of the length of the breach)**, shall not be deemed to be a waiver by said party of any of its rights hereunder. No waiver by Landlord or Tenant at any time, expressed or implied, of any breach of any provisions of this Lease shall be deemed a waiver of the breach or of any other provision of this Lease or a consent to any subsequent similar breach of breach of any other provision.

Ex. A §30 (emphasis added).  The anti-waiver clause is precisely the type enforced under Florida law, and accordingly bars the waiver and estoppel affirmative defenses.

But in addition to the legal flaw with the estoppel and waiver defenses, RSO's point to Lease Section 26 in a misguided attempt to argue that Hancock's only recourse for RSO's breach

under Lease Section 7 was to send a notice specifying the default, and, if RSO did not timely cure, then commence a lawsuit. Therefore, RSO argues that Hancock has waived or is estopped from suing for breach. RSO is wrong as a matter of law.

Section 26 does not state or imply it is the landlord's sole remedy in the event the tenant defaults. Rather, it states that if the tenant defaults, the landlord "**may give**" a notice of default, and that if the tenant fails to cure, the landlord "shall have the right to seek damages or an injunction…." Ex. A §26 (emphasis added). That Section 26 gave the landlord the option to notify the tenant there was a default, or to seek legal action, is consistent with the fact the landlord and tenant agreed to a comprehensive anti-waiver provision.

Here, Hancock and RSO agreed to Lease Section 7, which provides for the tenant's obligations regarding the Demised Premises. RSO, as the successor to KNK, has possessed the Demised Premises for decades and has allowed the building to deteriorate. Hancock commenced a lawsuit, and RSO has argued waiver and estoppel. Although Hancock did not bear the obligation to provide notice, any failure to do so could not constitute waiver because there exists the non-waiver provision in the Lease. *Apple Glen Investors, L.P. v. Express Scripts, Inc.* No. 8:14-cv-1527-T-33EAJ, 2016 WL 909322, at *1 (M.D. Fla. Mar. 10, 2016) (holding that even if the tenant could argue it had not received sufficient notice from the landlord, any failure to provide notice did not constitute waiver because of the non-waiver provision in the lease).

Further, RSO is estopped from arguing Hancock waived its right to sue or is itself estopped from suing because RSO executed a Tenant's Estoppel Certificate. [D.E. 2-5]. "Equitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position." *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001). "The doctrine of estoppel is applicable in all cases where one, by word, act or conduct, willfully caused another to believe in the existence of a certain state of things, and thereby induces

him to act on this belief injuriously to himself, or to alter his own previous condition to his injury."

*Id.*

In the Tenant's Estoppel Certificate, RSO stated "there are **no uncured defaults by . . . [RSO]** under the Lease **or any conditions which, with the passage of time or giving of notice or both, would become a default under the terms of the Lease**. . . ." [D.E. 2-5 (emphasis added)]. Hancock relied on RSO's statements to its detriment, and as a result, it did not sue until after the Lease terminated. RSO cannot on the one hand inform Hancock there are no defaults and acknowledge Hancock's right to enforce the Lease obligations, while at the same time defend on the basis Hancock should have sued earlier for a default RSO asserted did not exist in the Tenant's Estoppel Certificate, and argue Hancock waived its right to sue for those breaches. The Court should estop RSO, by virtue of executing the Tenant Estoppel Certificate, from arguing Hancock may not bring this action.

The Lease provides that Hancock's remedies for RSO's breach were not limited to Section 26. The Lease allows Hancock to pursue the remedies it chooses, at the time it chooses. There are no genuine issues of material fact as to RSO's waiver or equitable estoppel defenses. Hancock is therefore entitled to judgment as a matter of law regarding these affirmative defenses.

**7.     The Release Affirmative Defense Falls Short; Hancock Is Entitled to Judgment as a Matter of Law on the Release.**

The release defense asserted by RSO is ambiguous and vague, but fails based on the facts it has alleged supports it. [D. E 85 at 7]. A release must be knowing and voluntary, and is determined by weighing the totality of the circumstances surrounding the signing of an agreement by the releasing party. *See Myricks v. Fed. Reserve Bank of Atlanta*, 480 F.3d 1036, 1040 (11th Cir. 2007). The factors a court should consider include the plaintiff's education and business experience; the amount of time the plaintiff had to consider the agreement before signing; whether the plaintiff had an opportunity to consult with an attorney before signing; the clarity of the

agreement; whether the defendant encouraged or discouraged the plaintiff to consult with an attorney; and the consideration given in exchange for the release. *See id.*

None of the factors related to release apply here. Specifically, RSO pushes the defense based on Hancock buying the property and Lease in "as is" condition, and that RSO made an affirmative representation that it is not in default. A release is a specie of contract, and is subject to the law governing contracts. *See, e.g.*, *Gogoleva v. Soffer*, 187 So. 3d 268, 274 (Fla. 3d DCA 2016). The only contract between RSO and Hancock is the Lease. There is no contract between RSO and Hancock under which it knowingly and voluntarily released RSO. Instead, RSO concocts its argument based on the purchase and sale agreement between Hancock and FMAP. But RSO is not a third-party beneficiary to that contract. Under the contract between Hancock and FMAP, Hancock acquired all rights under the Lease, which binds RSO. Accordingly, it indisputable there is no release between RSO and Hancock.

RSO further pushes the defense by alleging that the Estoppel Certificate it delivered to Hancock somehow constitutes a release. But the Estoppel Certificate amounts to a representation at the time RSO made it that there are no breaches. There is no dispute that at termination, when RSO surrendered the Demised Premises without the improvements it received at Lease commencement, there was a breach. *See* Part A, *supra*.

Simply put, no release exists between RSO and Hancock. Thus, Hancock to judgment as a matter of law on RSO's release defense.

### 8.     RSO Has Misapplied the Failure of Consideration Defense; Hancock Is Entitled to Judgment as a Matter of Law Based on the Undisputed Facts.[21]

The failure of consideration does not fit the Lease because there is no dispute that Hancock performed its obligations under the Lease, and did not owe any consideration to RSO other than

---

[21] In its affirmative defense for failure of consideration, RSO refers to an agreement for maintenance it allegedly executed with Hancock Shoppes' predecessor, FMAP. For the reasons stated Part B(6) and B(7), *supra*, there is no agreement between RSO and FMAP modifying the Lease or RSO's obligations thereunder.

possession of the Demised Premises. "Under Florida Law, failure of consideration is the neglect, refusal, or failure of one of the parties to perform or furnish the agreed upon consideration." *BRE Mariner Marco Town Center, LLC v. Zoom Tan, Inc.*, 2016 WL 1704197, Case No. 2:15-CV-284-FtM-29CM, *1, *6 (M.D. Fla., Apr. 26, 2016). There are no facts to show that Hancock Shoppes neglected, refused, or failed to perform or furnish any consideration to RSO. [D.E. 85 at 8]. Rather, RSO claims one provision of the Lease, Section 23, contains its entire obligations with respect to repair and maintenance of the Property, arguing that any other obligations RSO owed to Hancock under the Lease lacked consideration. [D.E. 85 at 9].  RSO argues that Hancock demands RSO "restore the entire building to the condition it was in when originally constructed or better." [D.E. 85 at 8]. But Hancock only claims the damages owed for RSO breaching the Lease terms stated in Section 7A, 7B, and 11.

Under Sections 7 and 11, RSO, as an assignee by way of merger with KNK, who itself was an assignee from Kroger, bore the obligation to "keep and maintain or cause to be kept and maintained in repair and good condition . . . all buildings and improvements at any time erected on the Demised Premises, and shall use all reasonable precaution to prevent waste, damage or injury." Ex. A §7A. RSO was able to demolish any improvements so long as it substituted the demolished improvements with new improvements of greater value. Ex. A §7B. There is no dispute RSO demolished the HVAC units and all duct work, interior floor tiles, plumbing, electrical, and interior walls, and failed to replace these items with ones greater in value. Ex. P at 90:21-93:11. RSO was not required to return a new building to Hancock, but it was required to replace the demolished improvements as stated in the Lease.

The terms binding RSO may not be favorable, but they were dickered for when the parties entered into the Lease. Consideration supported the parties' bargain, and RSO should not be afforded the opportunity to have the Court rewrite the Lease because it is unhappy with its

obligations. There are no disputed issues of fact regarding the adequate consideration supporting the Lease and the terms RSO is now attacking. Hancock is therefore entitled to judgment as a matter of law.

**9.    The Assumption of Risk Tort Affirmative Defense Has No Place under Contract Law.**

In another attempt to misapply tort defenses to a contract action, RSO contends Hancock's claims are barred by express assumption of risk. This defense arises from an express contract not to sue for injury or loss that may thereafter result from negligence by the defendant. *See Kuehner v. Green*, 436 So. 2d 78, 79 (Fla. 1983). The defense considers whether the plaintiff subjectively appreciated the risk giving rise to the injury, and whether the plaintiff should have reasonably anticipated the risk involved. *Id.* at 80. In other words, the defense considers items irrelevant to the breach of a lease.

RSO is not using an express contract between it and Hancock out of which Hancock supposedly agreed to assume the risk. Instead, RSO is using the purchase contract between Hancock and FMAP – an agreement RSO did not sign and was not a party to, nor is RSO a third-party beneficiary of that contract. Under that contract, Hancock ascended to the rights and privileges of the lessor under the Lease, and with it acquired the rights to sue RSO for its numerous breaches. The fact there was an "as-is" clause in the purchase contract attempts to insulate FMAP's liability, not RSO's. Thus, the express assumption of risk defense is inapplicable to the case at bar, and the Court should reject it.

**10.   RSO Declared That Hancock Did Not Allege a Breach, Which Amounts to Denying the Claim and Fails as a Legally Sufficient Defense.**

The penultimate affirmative defense states that the contract claim Hancock has alleged is not a breach of the Lease. [D.E. 85 ¶ 11]. The defense relies entirely on one sentence from the Lease in Section 23 requiring RSO surrender the Demised Premises. Rather than repeat the

arguments Hancock has made regarding the several legal doctrine that address this purported defense, Hancock refers the Court to Part A, *supra.*

### 11.    FMAP Is Not an Indispensable Party.

Although RSO does not state any facts to support its claim that FMAP is an indispensable party, there are no set of facts that support the argument. Further, while RSO did not state clearly in the affirmative defense on which basis it is asserting the defense, it should fall under Federal Rule of Civil Procedure 19(a)(1)(A) governing the mandatory joinder of parties, which states in pertinent part the following: "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if. . . in that person's absence, the court cannot accord complete relief among existing parties . . . ." In other words, the court must determine whether the absent party is required under Rule 19(a). *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1039–40 (11th Cir. 2014).

The *Winn-Dixie Stores* case is instructive here because it addressed a tenant's argument that the landlord was an indispensable party in the claims alleged between two tenants. *Id.* The plaintiff tenant sought legal and equitable relief against the defendant tenant, and the trial court decided that it could award all the requested relief against the defendant tenant without haling the landlord into court. *Id.* The appellate court upheld the trial court decision because the landlord was not necessary to completely resolve the claims alleged between the tenants.

The case at bar presents far more undisputed facts demonstrating that FMAP is not an indispensable party. The contract at issue is between RSO and Hancock. The claim alleged arises from RSO's breaches. The Court may grant the relief Hancock has sought without requiring it join FMAP as a party in this matter because there are no allegations against it. Therefore, the undisputed facts and binding authority establish that Hancock is entitled to judgment as a matter of law on the failure to join an indispensable party defense.

C<small>ONCLUSION</small>

Based on the foregoing points and authorities, the plaintiff, Hancock Shoppes, LLC, respectfully requests the Court enter an Order granting Hancock's motion for partial summary judgment, and for such other and further relief as this Court deems proper.

**BECKER**
Attorneys for Plaintiff
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Telephone: (954) 987-7550
Facsimile: (954) 985-4176
JPolenberg@beckerlawyers.com
TFritz@beckerlawyers.com


By: _____
        Jon Polenberg, Esq.
        Florida Bar No. 653306


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by the Court's CM/ECF system on September 7, 2018 on all counsel or parties of record on the Service List below.

_____/s/ Jon Polenberg_____
By: Jon Polenberg, Esq.
**SERVICE LIST**

Michael J. Mueller
Hunton & Williams, LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
mmueller@hunton.com
**Attorney for Retained Subsidiary One, LLC**

KNK Food Stores, Inc.
By serving its Registered Agent: Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808
**Defendant**
ACTIVE: N24744/384111:11431438_1